IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. LKG-24-0137 |
| | ) | |
| CLARENCE LYNCH, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>**

Defendant, Clarence Lynch, through counsel, files this Memorandum in Aid of Sentencing to highlight the numerous mitigating factors in this case and assist the Court in its "overarching duty under § 3553(a) to impose a sentence sufficient but not greater than necessary to comply with the sentencing purposes set forth in § 3553(a)(2)." *Pepper v. United States*, 562 U.S. 476, 491 (2011) (internal quotes omitted). In support of a total sentence of eighty (80) months imprisonment – comprised of sixty (60) months for his use of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i), and twenty months (20), for committing a Hobbs Act robbery, in violation of 18 U.S.C. § 1951 - followed by three (3) years of supervised release, which varies below the ranged recommended in the Presentence Report ("PSR") under the advisory United States Sentencing Guidelines ("Guidelines"), Mr. Lynch submits the following:

## I.     PRESENTENCE     INVESTIGATION     REPORT     AND     GUIDELINE CALCULATIONS.

### A.     Introduction.

Relying on the application of USSG § 2B3.1, the PSR calculated Mr. Lynch's base offense level to be 20, and his Criminal History Category as I. PSR at ¶¶ 17, 34. The PSR recommends a two-level enhancement, under USSG § 2B3.1(b)(1), because money was stolen from a financial

institution, a two-level enhancement, under USSG § 2B3.1(b)(4)(B), because a victim was physically restrained, and a one-level enhancement, under USSG § 2B3.1(b)(7)(B), for loss amount of more than $20,000, but no more than $95,000. *Id.* at ¶¶ 17-20. Applying a three-level downward departure for acceptance of responsibility, pursuant to USSG §§ 3E1.1(a) & (b), the PSR recommends a total offense level of 22, and a sentencing range of 41-51 months, as to Count I. PSR at ¶ 63. The minimum term of imprisonment as to Count II is five years. *Id.* In accepting responsibility for his criminal offenses, Mr. Lynch has previously acknowledged the facts underlying these calculations and, therefore, does not object to them here.[1] Dkt. 57-1, at 1-2.

**B.      Objection to PSR reference to ambiguous and misleading data.**

Relying on data obtained from the Judiciary Sentencing Information (JSIN) system, the PSR asserts that "[d]uring the last five fiscal years, there were 43 defendants whose primary guideline was §2B3.1 and who were convicted of at least one count of 18 U.S.C. § 924(c), with a final Offense Level of 22 and a Criminal History Category of I, and of these defendants the "average length of imprisonment imposed" on these 43 defendants "was 134 month(s) and the median length of imprisonment imposed was 125 month(s)." PSR at 21. Stated in this way, the PSR implies these 43 other cases involve similarly situated defendants with similar mandatory minimum punishments. Because some or all of these cases involve more aggravated circumstances and/or significantly longer mandatory minimum sentences than at issue here, the PSR's inclusion of this data injects materially dissimilar cases to artificially and unfairly inflate the average and median sentences imposed. Further, because the PSR provides insufficient information from which

---

[1] In addition to admitting his guilty and pleading guilty, Mr. Lynch has demonstrated his acceptance of responsibility by submitting a letter to this Court which outlines in detail he remorse for his crime, a full acceptance of responsibility for his actions but also the distorted thinking that contributed to his offense and, most important, his awareness of the harm he caused to the community and the true victims of his crime. Let. from Clarence Lynch to Hon. Lydia Kay Griggsby of July 8, 2025, at 1-2, 6 (this letter is attached as **Exhibit A**).

such an inference can be drawn, Mr. Lynch objects to the inclusion of this data in the PSR and requests it be stricken from the report and not considered at sentencing.

Pursuant to 18 U.S.C. § 924(c), a defendant is exposed to an enhanced punishment for possessing a firearm during a crime of violence or drug trafficking. Where the weapon is merely possessed, a defendant faces a mandatory minimum sentence of sixty (60) months, where it is brandished, the mandatory minimum is eighty-four (84) months, and where the defendant discharges the firearm during the underlying offense, the mandatory minimum is one hundred-twenty (120) months. 18 U.S.C. § 924(c)(1)(A)(i)-(iii). Likewise, use of a short-barreled rifle or shotgun in furtherance of a crime of violence carries a mandatory minimum sentence of one hundred-twenty (120) months. 18 U.S.C. § 924(c)(1)(B)(i). Because the PSR makes no effort to identify the 43 cases or explain which of 924(c)'s mandatory minimum punishments were involved, reference to these cases – without proper context - is misleading and unfair as their inclusion dramatically increases the true average and median sentences imposed on defendants, like Mr. Lynch, who are only convicted of having "possessed" a firearm.

1.      **The JSIN data from individual, anonymized data files.[2]**

Using the same metrics identified in the PSR, undersigned counsel accessed the JSIN system to extract additional data from the United States Sentencing Commission's "Individual Datafiles" for the last five fiscal years. This information is publicly available on the Commission's website.[3] In replicating the JSIN data, counsel was able to identify 46 cases, four of which were excluded because the defendant received a USSG § 5K1.1 benefit, leaving 42 cases. Of those 42

---

[2] Undersigned counsel accessed the data discussed herein for the first time at 4:30 p.m. on August 19, 2025, with the assistance of the Federal Public Defender, and after completing the drafting of the memorandum. Thus, it is included here, along with the anecdotal evidence counsel compiled over the preceding several months, to illustrate and underscore the unfairness of considering dissimilar § 924(c) cases with higher mandatory minimum sentences.

[3] https://www.ussc.gov/research/datafiles/commission-datafiles.

cases, only four involved use/possession cases under § 924(c)(1)(A)(i), like Mr. Lynch's case, and the average sentence imposed in those cases was **80.25 months** imprisonment, with a median of 81 months. Table 1.

### TABLE 1

**2020-2024 cases with primary guideline §2B3.1 where
defendant convicted of at least one count of § 924(c),
an offense level of 22 and a CHC of I.[4]**

| MM for 924(c) offense | Number of cases | Mean | Median |
|---|---|---|---|
| 60 mos. | 4 | 80.25 | 81.00 |
| 84 mos. | 31 | 112.55 | 120.00 |
| 120 mos. | 3 | 168.33 | 168 |
| 168 mos. | 5 | 180.20 | 180.00 |
| 204 mos. | 1 | 210.00 | 210.00 |
| 252 mos. | 2 | 278.50 | 278.50 |
| **Total** | **46** | **130.07** | **125** |

As this data aptly shows, the inclusion of cases with higher mandatory minimum sentences – including mandatory minimum sentences as high as 252 months - dramatically skews upward the "average" and "median" sentences imposed in § 924(c) cases. For the 31 brandishing cases, the average sentence was **112.55 months**, and the median sentence was 120 months. For the 3 discharging/small-barrel firearm cases the average sentence was **168.33 months** and the median sentence was 168 months. For the remaining cases, which involved additional mandatory minimum sentences of 168 months, 204 months, and 252 months, the average sentences imposed were 180.20 months, 210 months, and 278.50 months respectively. In sum, based on an analysis of the anonymized data from § 924(c) cases during the last five fiscal years, the inclusion of dissimilar cases with significantly higher mandatory minimum sentences is grossly misleading

---

[4] A spreadsheet containing data 2020-2024 cases with primary guideline §2B3.1 where defendant was convicted of at least one count of § 924(c), had an offense level of 22 and a CHC of I is attached as **Exhibit B**.

because it unfairly and dramatically inflates the average and median sentences. To the extent this anonymized data is relevant it is to demonstrate that the average sentence imposed in cases that are materially similar to Mr. Lynch's case is about 80 months.

    2.    **Brandishing cases under § 924(c)(1)(A)(ii).**

    A PACER search for cases involving convictions for both 18 U.S.C. §§ 1951(a) and 924(c) in the District of Maryland uncovered numerous recent cases where defendants "brandished" firearms while committing a Hobbs Act robbery. These cases include: (a) *United States v. Torres Enriquez*, 8:19-cr-00214-PWG, Dkt. 93 (D. Md.) (**84-month** sentence, with one day for the robbery); (b) *United States v. Williams*, 8:17-cr-00578-TDC, Dkt. 166 (D. Md.) (**90-month** sentence with 84 months for brandishing, and 6 months for the robbery); (c) *United States v. Banks*, 8:17-cr-00578-TDC, Dkt. 120 (D. Md.) (same); (d) *United States v. Amilcar-Vasquez*, 8:19-cr-00214-PWG, Dkt. 102 (D. Md.) (**100-month** sentence with the 84 months for the brandishing, and 16 months for robbery); (e) *United States v. Moore*, 8:17-cr-00072-LKG, Dkt. 84 (D. Md.) (**114-month** sentences with 84 months for brandishing and 30 months for robbery); (f) *United States v. Latimore*, 8:17-cr-00526-PX, Dkt. 157 (D. Md.) (**120 month** sentence with 84 months for brandishing, and 36 months for robbery); (g) *United States v. Jones*, 8:17-cr-00072-LKG, Dkt. 102 (D. Md.) (same); and (h) *United States v. Murphy*, 8:17-cr-00578-TDC, Dkt. 125 (D. Md.) (**132-months** sentence was imposed, 84 months for brandishing, and 48 months for the robbery).

    For these more aggravated "brandishing" defendants, the average length of imprisonment imposed was 106 months, and the median sentence was 100 months, with the mandatory minimum for the §924(c) conviction comprising 80% of the total sentence. As such, the average term of imprisonment imposed on these defendants only for the Hobbs act robbery portion of their sentence was 22 months, and the median sentence was 16 months. At a minimum, including

brandishing cases in its analysis, the PSR pads the "average" and "median" sentences by at least 24 months, and likely more given that brandishing is weapon during a crime is clearly more culpable than merely possessing a weapon. By including the materially dissimilar "brandishing" cases in the calculation, the PSR unfairly and artificially inflates "average" and "median" sentences, with the primary distortion created by the significantly higher mandatory minimum portion of the sentences.

> 3.      **Discharging cases under § 924(c)(1)(A)(iii).**

Identifying specific comparable Hobbs act robbery cases involving ten-year mandatory minimums for discharging proved to be more challenging.  Even so, the cases counsel has been able to identify underscore that the inclusion of the "discharging" cases prosecuted under § 924(c)(1)(A)(iii) dramatically inflates the "minimum" and "median" sentences referenced in the PSR, without accounting for the significantly higher mandatory minimum.[5]

In *United States v. Johnson*, 8:19-cr-00013-PWG (D. Md.), the defendant pleaded guilty to one count of Hobbs Act robbery, and to discharging a firearm, in violation of § 924(c)(1)(A)(iii), and received a total sentence of **138 months** imprisonment, comprised of the 120 month mandatory minimum for discharging the firearm and 18 months for the robbery. In *United States v. Office*, 17-cr-00147-JPS, Dkts. 9, 12 (E.D. Wis.). In *Office v. United States*, 2020 U.S. Dist. LEXIS 259236, at *1 (E.D. Wis. 2020), the defendant pleaded guilty to one count of Hobbs Act robbery, and one count of discharging  a firearm during a crime of violence, and the court sentenced him to 24 months for the robbery and 120 months for the discharging charge, for a total prison term of **144 months**. Case No. 17-CR-147-JPS, Dkts. 14, 18. In *United States v. Griego*, 2024 U.S. Dist. LEXIS 34194 (D. Nev. 2024); 2:15-cr-00260-GMN-CWH-1, Dkt. 41, 55, the Defendant pleaded

---

[5] Counsel attempted to locate similar "discharging" and "short-barreled" gun cases in the District of Maryland and the Eastern District of Virginia before conducting national searches using LEXIS.

guilty to Count 1, a Hobbs Act robbery, and Count 2, for discharging a firearm under § 924(c)(1)(A)(iii). The Court sentenced defendant to 26 months custody as to Count 1, and 120-months custody as to Count 2, for a total of __146 months__ in custody).

Finally, in *United States v. McKinney*, 1:12-cr-00085-MR (W.D. N.C. 2020), the defendant robbed a barbecue restaurant in Asheville, North Carolina and when the manager of the restaurant did not move fast enough, petitioner fired the gun in his direction. *United States v. Clinton*, 3:10-cr-00208-RJC (W.D. N.C.); *McKinney v. United States*, 2020 U.S. Dist. LEXIS 15026 (W.D. N.C. 2020). DEF pleaded guilty to one count each of § 1951 and § 924(c)(1)(A)(iii) earning a sentence of 120 months for discharging the weapon and 70 months for robbery total, for a total sentence of __190 months__. *Id.* at *5. During the transaction, the defendant also hit a waitress in the head with the pistol, pointed a gun at the head of another employee, and ordered a third out of a car. *1. *See also United States v. Clinton*, 3:10-cr-00208-RJC (W.D. N.C.); *United States v. Clinton,* 547 Fed. Appx. 261, 262-63 (4th Cir. 2013) (__180 months__ imprisonment, 120 months for the 924(c) violation and 60-month concurrent sentences for two 1951 violations where firearm was discharged at a police officer while fleeing).

The average sentence imposed in these "discharging" cases was about 160 months, and the average sentence imposed for the Hobbs Act robberies portion of the sentence was about 40 months. The "median" sentence for the brandishing cases, was 146 months. As with the brandishing cases, the vast majority of the aggregate sentences imposed – fully 75% - consisted of 120-month mandatory minimum sentences for violating § 924(c)(1)(A)(iii). Compared to the brandishing cases, sentences in Hobbs Act robbery cases involving a discharged firearm were, on average, 54 months higher, and the median sentence was 46 months higher, which roughly approximates the higher moral culpability associated with firing a weapon, and the increase in the

mandatory minimum sentence (from 84 to 120 months).

4.     **Short-barreled gun cases under § 924(c)(1)(B).**

Like cases involving discharged firearms, Hobbs Act robberies completed through the use of a "short-barreled rifle, short-barreled shotgun, or a semiautomatic assault weapon," carry a mandatory minimum sentence of 120 months upon conviction under 18 U.S.C. § 924(c)(1)(B). Yet the PSR makes no effort to account for which, if any, of the 43 cases it references, involved the possession of one of these specifically prohibited weapons.

Counsel identified a handful of comparable Hobbs Act robbery prosecutions involving short-barrel firearms and in each case the bulk of each defendant's sentence consisted of the mandatory minimum punishment under § 924(c)(1)(B). For instance, Eric Woodberry was found guilty by a jury of one count of Hobbs Act robbery and one count of having brandished "a short-barreled rifle," in furtherance of the robbery,[6] *United States v. Woodberry*, 1:18-cr-0049-RAJ, Dkt. 191 (W.D. Wash.), and received a total sentence of __**138 months**__, 120 months for the firearm offense and 18 months for the robbery. Dkt. 196, at 2. Nicholas McDougal pleaded guilty to using a short-barreled shotgun to commit a Hobbs Act robbery, and was sentenced to __**144 months**__ imprisonment, with 120 months for the weapon, and 24 months for the robbery. *United States v. McDougal*, 4:13-20343-MAG, Dkts. 12 & 13 (E.D. Mich.). A jury convicted Paige Mathison of four crimes – conspiracy to commit robbery and robbery, both in violation of 18 U.S.C. § 1951, possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(B), and use of a short-barreled shotgun, in violation of 26 U.S.C. §§ 5845(a), 5861(d), and 5871 – and the district court imposed a sentence of __**147 months**__, 120 months for the 924(c)(1)(B) count, and

---

[6] Woodberry robbed a marijuana store and because he stole a significant amount of marijuana, he was also convicted of possession with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D), but received 18 months concurrent to his robbery conviction. Dkt. 196, at 2.

27 months for each of the other crimes, run concurrently. *United States v. Mathison*, 5:12-cr-04083, Dkt. 416, at 2 (N.D. Iowa). A jury convicted Mathison's codefendant, Rudy Johnson, of the identical offenses, and he received a higher sentence of **194 months** because he played a more active role in the offense and had previously committed other violent crimes. *United States v. Johnson*, 5:12-cr-04083, Dkts. 382-1 & 411 (N.D. Iowa). His sentence included 120 months for possession of a firearm in furtherance of a crime of violence, 37 months for the robbery, and 37 months for possessing a short-barreled rifle. Dkt. 411, at 2.

The average sentence imposed in these Hobbs Act robbery cases involving short-barreled firearms is 156 months, and the median sentence 144 months.[7] The average sentence imposed for the robbery portion of the sentence was 26.5 months. Consequently the mandatory minimum time imposed comprised 83% of these defendants' total sentences.[8]

### 5.    Similar cases involving no mandatory minimum sentence.

In addition to including demonstrably dissimilar cases in discussing "average" and "median" sentences imposed in Hobbs Act robbery crimes using a firearm, the PSR omits reference to similar cases where no mandatory minimum sentence was imposed. For instance, in *United States v. Spicer*, 1:19-cr-00506-RDB, Dkt. 102, at 1, 4 (D. Md.), the defendant was originally charged with one count of conspiracy to commit a Hobbs Act robbery, one count of the substantive robbery, both in violation of 18 U.S.C. § 1951, and one count of brandishing a firearm in further of the robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Spicer and his codefendants committed a home invasion and robbed multiple victims. During the incident, Spicer forced his

---

[7] Because three of these four defendants received no reduction for accepting responsibility, the average and median sentences for prosecutions involving violations of § 924(c)(1)(B), is almost certainly far lower than this data set implies. Conversely, it is also very likely the mandatory minimum imprisonments imposed in the short-barreled firearm cases make up an even greater portion of the aggregate sentence.

[8] For purposes of this calculation, the sentence imposed in *Johnson* for violating 26 U.S.C. §§ 5845(a), 5861(d), and 5871 was excluded, resulting in a total sentence of 157 months, with 120 for the 924(c) violation, and 37 months for the Hobbs Act robbery conviction.

way inside the victims' apartment, tackled one victim and put a firearm to his head, and accosted another victim, who was 8 ½ months pregnant at the time of the offense. (Dkt. 1-2, at 3-4). As part of the plea agreement, the Government dropped the 924(c) charge, and Spicer pleaded guilty only to the Hobbs Act robbery. Critically, however, the parties agreed that his "offense level was subject to a five (5) level enhancement under USSG § 2B3.1(b)(2), because a firearm was brandished during the commission of the offense." Dkt. 193, at 4. Without the 84-month mandatory minimum for the brandishing offense, the district court imposed a sentence of **78 months** imprisonment. Dkt. 259, at 2.

In *United States v. Ingram*, 8:16-cr-00526-PX, Dkt. 1 (D. Md.), the defendant was indicted for three for three counts of violating § 1951 while robbing or attempting to rob two separate cell phone stores, and two counts of brandishing, one for a completed robbery and one for an attempted robbery. *Id.* at 3-4. As in *Spicer*, the Government agreed to dismiss the 924(c) charge, and Ingram pleaded guilty only two counts of Hobbs Act robbery, one completed and one attempted, but he agreed to a five (5) level in his guideline calculation, under "USSG § 2B3.1(b)(2)(C), because a firearm was brandished as part of the offense." Dkt. 34, at 4. Although Ingram's guideline range was increased two additional levels because the victim sustained a bodily injury, and one level due to a loss amount between $20,000 and $95,000, an adjusted offense level of 26, and sentencing range of at least 63-78 months, *id.* at 5, he received sentences of 20 months for each offense, to run concurrently, for a total sentence of **20 months** imprisonment. Dkt. 56, at 2.

Finally, in *United States v. Jones*, 3:17-cr-00061-JAG, Dkts. 7 & 49 (E.D. Va.), the defendant and his codefendant robbed five a 7-Elevens and one Sonoco in Chesterfield, Virginia area, and brandished handgun in furtherance of the robberies. The defendants also wore a masks to avoid detection. Dkt. 7 at 3-13, Dkt. 49, at 3-13. Jones was indicted for fourteen counts,

including one count of conspiracy, six Hobbs Act robberies, and two counts of brandishing a firearm in violation of § 924(c)(1). Dkt. 7, at 13-15, Dkt. 49, at 14, 15-16. As part of his agreement, Jones pleaded guilty to a single Hobbs Act robbery, the Government dismissed all other charges including the two brandishing counts, and the parties agreed to a total sentence of __46 months__ imprisonment, Dkt. 75, at 3; Dkt. 91, at 1, which the court imposed. Dkt. 94, at 2.

*    *    *

As this discussion aptly shows, the inclusion of the more aggravated ways to violate 924(c), which carry far higher mandatory minimum sentences, completely distorts that PSR's description of "average" and "median" sentences by dramatically inflating those metrics and injecting dissimilar cases into the analysis. Where "a presentence report omits crucial information, leaving ambiguity on the face of that document, the government has the burden of independently demonstrating the accuracy of the report." *United States v. Marks*, 864 F.3d 575, 580 (7th Cir. 2017). Absent the provision of sufficient information to allow Mr. Lynch to offer a meaningful rebuttal, consideration of PSR's reference to 43 other, unidentified cases would Due Process. *See Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (elemental due process requires an opportunity to rebut evidence used to enhance a defendant's sentence); *Simmons v. South Carolina*, 512 U.S. 154, 169 (1994) (same); *Gardner v. Florida*, 430 U.S. 349, 362 (1977) (holding the use of secret information to enhance a defendant's sentence constitutes a fundamental denial of due process); *United States v. Polson*, 285 F.3d 563, 567 (7th Cir. 2002) ("Due process requires … that the sentencing court afford the defendant a meaningful opportunity to rebut contested evidence."). Because the PSR's reference to 43 unidentified cases injects arcane and arbitrary issues into the Sentencing Guidelines calculations, it should be stricken. *Marks*, 864 F.3d at 580 ("When an

arcane and arbitrary issue arises under the Sentencing Guidelines, the sentencing judge should ask why he or she should care.").

That said, the injection of these dissimilar cases has one critical value which was to quantify the "average" sentences imposed solely for the Hobbs Act robbery portions of the aggregate sentences, which works about to be 22 months for defendants that "brandish" firearms in furtherance of the offense, 40 months for defendants who discharge the firearm, and 26.5 months for defendants who use a short-barreled rifle or shotgun. Because a person who merely possesses a firearm in furtherance of a robbery is appreciably less dangerous and less culpable than defendants who brandish, discharge or use short-barreled weapons, the sentences imposed in these dissimilar cases support the imposition of a sentence less than 22 months for Mr. Lynch's violation of 18 U.S.C. § 1951. This is entirely consistent with the four anonymized cases included in the JSIN data which are most similar to Mr. Lynch's case because they have the same 60-month mandatory minimum sentence and an average sentence of about 80 months.

## II.    NON-GUIDELINE SENTENCING CONSIDERATIONS.

### A.    Mr. Lynch's History and Characteristics.

There is no presumption of reasonableness attached to the sentencing guidelines. *See Nelson v. United States*, 555 U.S. 350 (2009). They serve only as a "starting point and initial benchmark" of a just sentence. *Gall v. United States*, 552 U.S. 38 (2007). The sentencing range established by the guidelines is just one of many factors for this Court to consider. *See* 18 U.S.C. § 3553(a)(4). Thus, after ensuring the accuracy of Mr. Lynch's guideline calculation, the analysis does not end. Rather the Court must consider facts that would support any grounds to vary below the guidelines. Variances must be considered separately from how the guidelines would

treat them if argued as departures. *See United States v. Booker*, 543 U.S. 220, 234-35 (2005); *see also Gall*, 552 U.S. at 38.

A just sentence for Mr. Lynch, then, requires close consideration of multiple other § 3553(a) sentencing factors without special deference to the sentencing scheme established by the guidelines. The guidelines make up but one portion of the applicable statutory sentencing factors, § 3553(a)(4). The remaining statutory sentencing factors include: the nature and circumstances of the offense and the history and characteristics of the offender§ 3553(a)(1); the need to provide a sentence that is sufficient but not greater than necessary for purposes punishment, deterrence, incapacitation, and rehabilitation, § 3553(a)(2); the kinds of sentences available, § 3553(a)(3); and the need to avoid unwarranted sentence disparities, § 3553(a)(6). These additional factors provide for mitigating features not adequately taken into consideration by the guidelines while undercutting the rationale behind the imprisonment range produced by the guidelines. Together, the statutory sentencing factors support a variant sentence of seventy-two months imprisonment.

### 1.    Mr. Lynch's adverse childhood experiences.

"Highly relevant, if not essential, to the selection of an appropriate sentence is the possession of the *fullest information possible* concerning the defendant's life and characteristics." *Pepper,* 562 U.S. at 476 (emphasis added). "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Mr. Lynch asks this Court to consider where he comes from and how his past – particularly his dysfunctional upbringing, diagnosed disability, and behavioral disorders - impaired his judgment and decision-making abilities. He is the product of a highly dysfunctional childhood and a community saturated by criminality.

Mr. Lynch was reared in an unstable, toxic environment and deprived of meaningful emotional and moral supports from birth. As a child, and for most of his life thereafter, Mr. Lynch lived in the Southeast part of Washington, DC, which, as the Court is well-aware, is one of the most crime-ridden parts of our country where violent gangs deal drugs and commit an unending string of murders. According to several witnesses who grew up with Mr. Lynch, their neighborhood was filled with drug addicts, prostitutes, dope peddlers, and all other kinds of criminals.[9] According to Mr. Lynch's older sister, Tayana Lynch:

> We all lived in Southeast Washington, DC and our house was around the corner from [our grandparents]. The neighborhood was not great. For the most part, people were really poor, the houses were rundown, there weren't any nice places nearby to go, and there were no real grocery stores. Worse still, there was a lot of drugs being sold, prostitutes in the neighborhood, and we heard shootings almost every day.[10]

Mr. Lynch's maternal grandmother, Roberta Carpenter, put it even more starkly in her letter to the Court:

> Because of the poverty and failing schools, our neighborhood was filled with people who were struggling with drug and alcohol problems, could not maintain consistent employment, and were having kids they really could not care for. This led to a lot more problems. We did what we could as parents to try to ensure their safety and success to not be a product of their environment, but it was really hard to do that were we lived.[11]

Mr. Lynch's exposure to criminogenic modeling was extremely intimate in his early childhood, as several close family members were involved in criminal activity and the penal system, including his grandfather and uncles.

> Growing up, Clarence lived with the influence of crime around him. My father, his grandfather D'Wayne Carpenter, had a criminal history. Growing up my Dad was

---

[9] Let. from Tayana Lynch to Hon. Lydia Kay Griggsby of July 24, 2025, at 2 (this letter is attached as **Exhibit C**); Let. from Beverly Carpenter to Hon. Lydia Kay Griggsby of July 22, 2025, at 1 (this letter is attached as **Exhibit D**); Let. from Roberta Carpenter to Hon. Lydia Kay Griggsby, undated of, at 1 (this letter is attached as **Exhibit E**); Let. from Dominic Cross to Hon. Lydia Kay Griggsby of August 1, 2025, at 1 (this letter is attached as **Exhibit F**).
[10] Tayana Lynch let. at 2.
[11] Roberta Carpenter let. at 1.

in and out of jail most of our lives for different things. Also, his uncle, Robert Carpenter was a troubled youth. He was also in and out of youth detention centers and group homes. Clarence saw and experienced this first hand. I remember one time we were all at my house. Clarence slept in the bed with my parents. Early one morning, The US Marshall Service came and arrested my Dad. I remember watching a very scared child, Clarence, being handed to my Mom to get him out of the room while my Dad was being taken into custody.[12]

…

Our grandfather was in and out of jail for most of our lives for various crimes, and this modeling had a very negative effect on Clarence. Our Grandfather would disappear for months or even years at a time without explanation so we came to understand he was in jail or prison. Clarence also saw witnessed how our uncle, Robert Carpenter, fell into a life of crime and bad behavior. Robert was a juvenile delinquent and his criminal activity continued into adulthood. He was rude and disrespectful to our grandmother in front of Clarence, and its easy to see that these experiences and influences impacted Clarence's development and behavior. To say it bluntly, growing up in crime-ridden neighborhoods and households, totally normalized the illegal conduct and a criminal mindset.[13]

The dangers inherent Mr. Lynch's community were greatly amplified by the conflict-ridden relationship between Michele Lynch and Reginald King. For his part, King was a notorious womanizer who fathered eighteen children and impregnated the much younger Ms. Lynch, who already had several children of her own, shortly after they met.[14] PSR at ¶ 49. The relationship was short-lived as King was abusive, manipulative and controlling towards Mr. Lynch's mother, Michele Lynch, forcing her to leave and attempt to raise her family on the salary of school bus driver.[15]

The poverty and lack of social support led to a worsening dynamic of instability, problematic attachments, and emotional abuse. According to Tayana Lynch

Let me start by letting you know that Clarence did not have an easy childhood…. As a little boy, Clarence was shuffled back and forth between his mother, father, and my grandparents, Roberta and D'Wayne Carpenter, and had a

---

[12] Beverly Carpenter let. at 1.
[13] Tayana Lynch let. at 2.
[14] *Id.* at 1.
[15] Let. from Michele Lynch to Hon. Lydia Kay Griggsby of Aug. 4, 2025, at 1 (this letter is attached as **Exhibit G**).

very unstable upbringing. When Clarence was still young he stayed mostly with his dad who was particularly hard on Clarence which strained their bond and caused deep resentments. Reginald was in denial that he was going blind which put Clarence in an enabler role. For instance, even though Reginald was losing his ability to see he still drove a car and would use Clarence as his eyes to tell him if the light was green or red, when he was too close to another car, and other things while he drove. This was extremely stressful on Clarence because he was just a child being forced into a dangerous situation and doing grown up activities. Clarence was only five or six years old. When Clarence was around seven his father went blind and was declared permanently disabled. Reginald fell into a severe depression and could no longer take care of Clarence and he came to live with us full time. This experience was shattering for my brother because it upended his life and removed the only father-figure he had. Clarence was very sad and grew depressed. He did not see his dad for several years and not having his dad, even one that was abusive, hurt him a lot.[16]

King also used his son to manipulate and spy on his mother, in what amounts to a form of abuse called parental alienation. By inducing Mr. Lynch to be an adversary against his own mother, King devalued her role as a mother and authority figure to his son, while involving him in a harmful adversarial relationship creating even greater instability in his mother's house. King's "treatment of his son was abusive and really upset Clarence because he grew up experiencing his father's love as conditional, purely based on material things, and transactional because Reggie only showed Clarence love when he wanted to use him to advance his own agenda."[17] Even worse, because the manipulations were directed at harming Mr. Lynch's mother, they injected an element of tension and lack of security into a place of safety, resulting in the development of disrespect for his mother and authority in general.

Around age seven, Mr. Lynch's father became legally blind and effectively retreated from his life for nearly five years as he sank into self-pity and depression. Although the relationship with his father had largely been abusive and manipulative before then, the sense of abandonment was shattering to Mr. Lynch as he lost the only father figure he had ever known. Thus, although

---

[16] Tayana Lynch let. at 1.
[17] Beverly Carpenter let. at 2.

one element of instability – namely being shuffled back-and-forth between homes in their impoverished neighborhood – was removed from Mr. Lynch's life, other toxic variables were injected and amplified. Specifically, he was now living primarily under the roof of a single mother who had little time to supervise him and who he did not respect, and the absence of meaningful structure made him even more susceptible to toxic peer influences.

Starting at age eight, Mr. Lynch began to visibly struggle due to a combination of having no safe place to live, an undiagnosed Attention Deficit Hyperactivity Disorder, significant behavioral problems, emotional dysregulation, and a later-diagnosed learning disability. Thereafter, he struggled in school, was bullied and shamed for having mental problems and taking medication. Not surprisingly, Mr. Lynch began to act out as school became increasingly hard for him and he became alienated from his peers. Although his mother tried to intervene – by moving him several times to different schools - Mr. Lynch's erratic behavior only intensified and he was ultimately placed in the Psychiatric Institute of Washington. As his sister recounts,

> Clarence started to really struggle with his own issues. He was depressed and angry about all the upheaval in his life. He had a hard time sitting still in school and started getting bullied by other kids. Eventually Clarence started to acting out in school and the community. He became defiant and had a hard time keeping his emotions in check. It didn't help that the school work was too hard and that he had changed schools so many times. At some point before he was twelve years old, he was placed in the Psychiatric Institute of Washington (PIW) because of his behavior and mental health issues. While at PIW he was diagnosed with ADHD and they prescribed him medication which further altered him. Its hard to say just how the meds changed Clarence but he did not seem like himself and he harbored a lot of shame for being on medication.[18]

By this point, Mr. Lynch had attended four different schools and came under the rubric of the District of Columbia Department of Youth Services and numerous placements in alternative schools and eventually out-of-state facilities in Iowa and Florida. PSR at ¶ 57.[19]

---

[18] Tayana Lynch let. at 1.
[19] Roberta Carpenter let. at 3; Michele Lynch let. at 1-2; Beverly Carpenter let. at 3.

Beverly Carpenter, Mr. Lynch's aunt, described this period as extremely tumultuous for her nephew because he was frustrated and angry, confused by the instability in his life, lacking in meaningful social supports, and harmed by the re-entry of his biological father into his life.

> [T]here came a time when Clarence stopped staying at my house and was left in the care of his older siblings. Christopher, his older brother, was old enough to be home with Clarence and Tayana in the mornings because Michele worked for the school bus system and would have to be to work before the kids got up for school. Clarence did start to take a school bus to school as well. Once when I asked why Clarence wasn't staying with at our house anymore, I was told it was because he was being taken to a special school to help him with his academics because he had a learning disability. In the years prior to that Clarence had went to a bunch of different schools until he was placed in one with the right program. I didn't understand this at the time, but now as an adult, I realize he had an IEP because of a disability and needed help in order to be able to do the school work. Around the same time Clarence started getting medications to help him focus and regulate his emotions. This was hard for Clarence because it made him feel like some kind of defective kid. He got teased by the other kids and felt ashamed to have mental problems.
>
> While experiencing this, Clarence still dealt with the harshness of his father. I would see him get a call from Reggie and go through an emotional roller coaster. He would get excited for the call, then sad and disappointed and eventually hurt and irritated by the time he got off phone. I remember one time, after a call with his father, Clarence was so upset and unregulated that he tore his room apart while screaming in an uncontrolled way. After about thirty minutes of this, we did not hear a peep out of him until the next day. It got to the point that Clarence could not regulate his feelings because they were constantly being emotionally abused by his father. Even after Reggie became blind, it didn't stop. If anything, the abuse got worse because Reggie was so depressed and miserable and he took it out on Clarence. When the kids at Clarence's school heard about Reggie's blindness, they teased and bullied Clarence to make him feel like an even worse defective. They called Clarence names and teased him about having a dad that was blind. This, coupled with the already strained relationship with his father was a lot for Clarence to handle.[20]

The structure provided by the out-of-state institutions was helpful in the short term, but absent meaningful aftercare and structure in his home, Mr. Lynch continued to be overly influenced by toxic peers in his community of origin.[21]

---

[20] Beverly Carpenter let. at 2-3.
[21] *Id.* at 3; Roberta Carpenter let. at 3; Clarence Lynch let. at 4; Dominic Cross let. at 1, 2.

Despite his academic and emotional challenges, Mr. Lynch demonstrated a degree of determination and resilience by insisting on earning a high school diploma, but not without experiencing a significant setback.[22] Because of all the instability in his life, Mr. Lynch lacked credits to graduate on time and had complete an additional year. In that year, Mr. Lynch received job training and worked for a period of time as a busboy and waiter at a restaurant in Alexandria, before it shut down due to the pandemic. Later, he took a job working for a tow truck company that was hard, dirty and dangerous, to earn money.

As discussed in more detail below, Mr. Lynch has used his time in jail to reflect and take stock of his life, and to use his prosecution as a reset of sorts. He has become far more aware of his limitations and the influences and motivations which led to his crime:

> I did not commit my crime for my daughter. I told myself that but it's a lie. I committed my crime for myself. I committed the offense because I wanted money and I wanted to feel good about myself. I did it because I was intent on trying to start a new life and needed money to do that. I planned to leave Maryland and move to Florida and I needed money so I took money that did not belong to me. My desire to get rich quick blinded me to what I was doing to my daughter. It also blinded me to the harm I caused the victims.
>
> Once I started taking responsibility for what I did, I started to chart a new course for my life. I had always stayed in close contact with my daughter and family, but once I owned my conduct, those communications got better. For the first time I started to think beyond the next day or week and planning for a future. More than anything I want to be the foundation for my daughter and I cannot do that unless I am realistic about what I need to do to become a better father and man. I have been striving to do that not just by investing in my daughter, but by taking classes a the jail to become a better father.
>
> I know that I have a long way to go, but for the first time in my life I have more hope for my future and more realistic ability to contribute to society. I know that I still have a lot of work to do, but I am now ready to do that work and have started doing that work. I deeply regret that I committed this offense and harmed innocent people. There is no excuse for what I did, and I don't make any excuses. I only ask the Court to consider all the facts about my life and crime and give me a just sentence.[23]

---

[22] Beverly Carpenter let. at 4; PSR at ¶ 56.
[23] Clarence Lynch let at 4-5.

As his words, conduct in jail, and commitment to his family and daughter clearly show, Mr. Lynch

is worthy of redemption and a second chance.

### 2.     Mr. Lynch is a loving and devoted father.

Long before he became a father himself, Mr. Lynch was a positive influence on the children

in his life, including his nieces and nephews, and children that attended the daycare center where

his grandmother worked for over a decade. Whether it was his own lack of a positive childhood or

the vicarious joy he experienced by being around children, Mr. Lynch is universally regarded as

an extremely positive influence on children.[24] His sister Tayana Lynch describes her younger

brother as a surrogate father to her first-born, because she brought her daughter into the world as

a single mother and that from the day she learned she was pregnant, Mr. Lynch was excited and

committed to becoming an uncle.

> When I got pregnant with my daughter Nyla when Clarence was in his late
> teens and he immediately went into uncle mode. Even though he was still young,
> Clarence wanted to help out as much as possible. From the moment she was born
> he showed her unconditional love and treated her like his own daughter. He
> changed her diapers, would help feed her, he would watch her when I needed help,
> and he showed her a lot of affection. He and Nyla developed a very close bond and
> when she started talking she would call him "Uncle Dad" because that's literally
> the relationship that had developed. We all thought this was really cute and it made
> Clarence proud to have such an important role in her life.

> When Nyla was less than two years old, Clarance got a job at restaurant to
> earn money to help support our family. He did not earn a ton of money but whatever
> he brought home he used to pay bills, support himself, and buy things he wanted
> Nyla to have. He was only in high school but Clarance really stepped up to be a
> father to his niece when her own father was not present. Clarence acting as a
> surrogate dad was a Godsend to both me and Nyla. We always say he has two
> daughters, Nyla first and Jada second. You wouldn't be able to tell the difference
> because he pours out love to both and treats them in the same tender way. He made
> sure to visit and/or talk to Nyla everyday, which he still does now even though he
> is incarcerated. He made sure she knew she was well loved and valued. As a young
> black girl, growing up in DC, I have not seen a lot of fathers around, so for him to

---

[24] Roberta Carpenter let. at 3-5; Tayana Lynch let. at 3-4; Let. from Christopher Lynch to Hon. Lydia Kay Griggsby, undated, at 1 (this letter is attached as **Exhibit H**); Beverly Carpenter let. at 5.

step up and take on that role at a young age, it really showed his maturity and selflessness to give her something she would've been without.[25]

Mr. Lynch's older brother shares these observations and describes Mr. Lynch as the "best uncle anyone could hope for."[26]

> Clarence has been a very positive influence on my sons, Chris and Cairo, as well as our nieces. He is affectionate and funny with the kids and whenever he has money, he buys them presents or takes them for ice cream or to get something to eat. On summer days when school is out and either one of us didn't have too much, we would take my boys to go to water parks, go-kart tracks, or play in the park. Spending time with Clarence will always make my sons' day. Clarence is the best uncle anyone could hope for. When we get together as a family, Clarence brings a lot of energy and makes sure everyone feels welcome and special.[27]

Given his love and devotion to his siblings children, it was unsurprising to Mr. Lynch's family that when he learned he was going to become a father, he was preternaturally prepared to be attentive, affectionate, and doting.

> [When] Clarence learned he was going be a father and he was so excited I thought he might explode because he really wanted to be a dad. Clarence did everything to prepare like buying baby clothes, diapers and toys. He also got a job working on a tow truck to earn money. The work could be a little scary, but some nights it paid really good. Clarence used his money to prepare for the baby. When Jada Nicole Lynch finally came into this world, she weighed exactly the same weight Clearnce was when he was born. I never saw my son happier than the day Jada was born and the months after. I knew he was going to be a good dad because he had been preparing since he was a little boy and he often said he was going to learn from his parents' mistakes.[28]

By all accounts from the people who know Mr. Lynch best, he has been an excellent father to his daughter, and his commitment and devotion to her well-being has only grown since his arrest, despite the challenges imposed by incarceration.[29] Indeed, in addition to reflecting on the harm he

---

[25] Tayana Lynch let. at 3.

[26] Christopher Lynch let. at 1.

[27] *Id.*

[28] Michele Lynch let. at 4.

[29] Tayana Lynch let. at 4; Beverly Carpenter let. at 5; Christopher Lynch let. at 1-2; Roberta Carpenter let. at 4; Dominic Cross let at 2; Let. from Hillard Wilson to Hon. Lydia Kay Griggsby of Aug. 3, 2025, at 1 (this letter is attached as **Exhibit I**); Let. from Wilson Whitaker to Hon. Lydia Kay Griggsby of Aug. 6, 2025, at 1 (this letter is attached as **Exhibit J**); Let. from Lakisha Price to Hon. Lydia Kay Griggsby Aug. 3, 2025, at 1 (this letter is attached

has caused to his daughter by his own actions which take him physically away from her, Mr. Lynch

calls his daughter daily to be present in her life and to fulfill, as best he can, the role of being her

father.[30] Sadly, Mr. Lynch now recognizes his own desire to be a stable father and provider to his

daughter propelled him into trying to get rich quick to start a new, albeit unsustainable, life for

her.[31] In hindsight, Mr. Lynch realizes desire to create an economic was selfish and designed to

make himself feel good, but essentially ignored the risks involved as well as his own daughter's

needs.[32]

> ### 3.    Mr. Lynch is a protective and generous person who has positively impacted many lives.

Despite his own challenging upbringing and poor life decisions, Mr. Lynch has had a

positive impact on many people, including family members and friends. He is a generous, loyal,

protective and loving person, who never hesitates to share and engage. He has devoted time to

volunteering and mentoring in his community, and treats people with respect.[33] These selfless

qualities are best illustrated in the letters submitted on his behalf. For example, Mr. Lynch's

grandmother, who has experienced significant health problems, came to depend on her grandson

when she lost mobility:

> In the last year before his arrest, I observed some positive changes in
> Clarence's behavior that showed he was maturing and was capable of growing. For
> one, he got a job towing vehicles. His work was mostly at night and could be
> dangerous, but he earned decent money. He used this money to help members of
> our family, including his mother, by paying for groceries or helping with rent. He
> also started suspending a lot more time at my house. Clarence had always helped
> me and made sure I was okay, but I have slowed down a lot because of health issues
> and getting older. Every morning after he worked a late shift, Clarence made sure

---

as **Exhibit K**).

[30] *Id.* at 5; Clarence Lynch let. at 5, 6.

[31] *Id.* at 5.

[32] *Id.* at 5-6.

[33] Let. from Tanisa Ewell to Hon. Lydia Kay Griggsby Aug. 1, 2025, at 1 (this letter is attached as **Exhibit L**); Let. from Ebonee Herd to Hon. Lydia Kay Griggsby Aug. 1, 2025, at 1 (this letter is attached as **Exhibit M**).

he always helped me get out of the car and do things around the house. When I was diagnosed with breast cancer Clarence took it very hard but was still there for me. He came to visit regularly and made sure I wanted for nothing. He would help me run errands and do little projects around the house that I could not do myself. His arrest has had a big impact on me personally as I now have no one to help me that independent.[34]

This generosity of spirit and protectiveness is not new, as it has characterized Mr. Lynch's conduct toward family members, particularly females, since his childhood. As his cousin Beverly Carpenter recounts,

> Clarence … grew up to be something of a protector especially for the women and girls. When I was in high school an older boy from our neighborhood started bothering me by saying inappropriate things that made me feel like he could assault me. The guy was pretty big and scary to me. I never told Clarence what was happening, but he must have overheard me talking to my mother because the next day Clarence confronted the boy and told him forcefully that he had to stop messing with his "niece" or he would have bigger problems. Clarence wasn't overly aggressive or nasty, but more forceful and confident in his demeanor. He showed that he did not want to cause trouble but that he was prepared to protect me if the harassment did not stop. Because the other boy was bigger than Clarence, and had a reputation as a fighter, it took a lot of courage to stand up to him to protect me. The fearlessness showed to protect me holds a place in my heart because he was younger but he was willing to risk his own safety for me. He's been consistent with this protection for all of the family and friends since he was still a boy. It has not stopped since his arrest because he still calls to check up on me to make sure no one's bothering me and making sure that my boyfriend is treating me right.[35]

Mr. Lynch's generosity is not limited to his family as he has greatly impacted other people in need. Community activist Taniesa Ewell, has been friends with Mr. Lynch for many years and recalls a challenging circumstance where Mr. Lynch's selflessness positively impacted her life:

> To share one example of how Clarence is generous and kind is very personal to me. About five years ago my car was stolen. It was not a fancy car by any means, but it was the essential ingredient to making my life manageable. At the time I was a single mom attending school, and working part time. To make my life possible I had to have reliable transportation, so when it stolen I didn't know how I would cope. When Clarence learned about my misfortune, he volunteered to help get me from place to place and he eventually gave me some money to help me buy a new car. Those weeks were some of the most stressful of my life because I felt I was on

---

[34] Roberta Carpenter let. at 4.
[35] Beverly Carpenter let. at 3-4.

the brink of collapse. Clarence came through for us when we needed it and I am eternally grateful.[36]

Even more relevant to the predicament Mr. Lynch has created for himself, has been his past commitment to friends and family who were incarcerated. Dominic Cross, a friend since childhood, describes Mr. Lynch as indispensable to his survival in prison and transition into becoming a productive member of society:

> While I was struggling in prison, Clarence was my rock. He was the only male friend I had [who] came to visit me and called me regularly. The truth is that when you go to prison, most people except your immediate family forget about you and except for Clarence that is how it was for me. Clarence stayed in contact with me on a weekly basis, put money on my commissary and helped me stay more positive. Because Clarence never blames anyone for his own choices, he encouraged me to stay positive and focused on my future. Another thing Clarence did for me was check in on my family. He would visit my mother and call her and my girlfriend. If they ever needed something, Clarence would get it for then. They were both struggling because I was not around to help out. Clarence had always been like a brother to me, but this was different because he went above and beyond. To be totally honest, Clarence was the main support that got me through prison and was really important to my own rehabilitation. In those moments when I felt like I was in a deep dark place I always could count on him for reassurance.[37]

Mr. Lynch's cousin, Wilson Whitaker, recalls a similar experience where Mr. Lynch played a pivotal role in his own rehabilitation.

> On a more personal note, Clarence was there for me too. I'm not proud of the fact that I too was incarcerated and made a lot of mistakes. When I was released, Clarence stepped up and helped me out both financially and by giving me emotional support. I know it would have been a lot harder for me if it wasn't for Clarence. There just aren't real services for people coming out of prison so it becomes a temptation to do things to get money to survive. I've been doing good, working and have totally stepped away from the things that got me into trouble and Clarence gets some of the credit for that. If I can repay the favor when he gets released you know I will.[38]

Admittedly, Mr. Lynch is a work in progress. He is young and made a horrendous mistake

---

[36] Taniesa Ewell let. at 1.
[37] Dominic Cross let. at 1.
[38] Wilson Whitaker let. at 1.

as a result of poor modeling and even worse judgment. Even so, Mr. Lynch possesses many admirable qualities and character traits that will support his rehabilitation provide the foundation for him make a positive adjustment to prison and to then have prosocial impact in his community and on society in general.

### 4.    Mr. Lynch is genuinely remorseful.

In addition to formally accepting responsibility for his crimes, Mr. Lynch is also genuinely remorseful his crime, particularly for having put innocent people in fear for their lives and the impact his absence will have on his daughter:

> I am very sorry for my crime. There is no excuse for what I did, even if I justified it in my own mind at the time I did the crime. I am most sorry for the gentlemen who were working in the store I robbed and [for] putting them in fear for their lives. Even though I never intended to hurt anyone, when you use guns that's a possibility and I think they must have thought they could be killed. The past two years I have thought about my crime [and] how my actions deprived my daughter of her father and her mother of a partner. More than anything I've thought about the real victims of my actions and how I probably made them terrified. Maybe they struggles with this fear and were traumatized. Maybe they had to quit working and couldn't provide for their families. Maybe they had to go see a counselor to get over the hard I caused them or even worse. If I could … talk t them …. I would ask them if there was anything I could do to help them and take away their fear. [ W]hat I did was selfish and really neglected the health and safety of people who were just doing their jobs and I am deeply sorry for that harm.[39]

These are not merely words. They are backed up by decisive actions and irreversible consequences. Despite being incarcerated in five different institutions since his arrest, most far away from his daughter and family, Mr. Lynch took responsibility for his crime, pleaded guilty and agreed to spend a significant time in prison – likely the remainder of his 20's when his daughter is forming her first memories.

Although the lack of remorse is more commonly cited as a reason for an upward variance, *United States v. Rios-Rivera*, 913 F.3d 38, 46 (1st Cir. 2019); *United States v. Davis*, 458 F.3d

---

[39] Clarence Lynch let. at 1.

491, 499 (6th Cir. 2006), *vacated on other grounds by Gall v. United States*, 552 U.S. 38 (2007), sincere expressions of remorse are an accepted basis for varying downward, even for serious crimes. *See, e.g., United States v. Beach*, 275 Fed. Appx. 529, 532-33 (6th Cir. 2008) (district court did not exceed discretion in imposing 96-month sentence varying downward from Guidelines range of 210-240 months for violation of 18 U.S.C. § 2252(a)(1) based in part on defendant's remorse); *United States v. Taylor*, 2022 U.S. Dist. LEXIS 86082, *13 (S.D. W.Va. 2022) ("Court recognized the Defendant's sincere remorse and family obligations in granting downward variance" in heroin distribution case); *United States v. Johnson*, 2021 U.S. Dist. LEXIS 34217, *2-3 (W.D. Pa. 2021) (court credits defendant's early acceptance of responsibility and remorse in granting downward variance); *United States v. Bleicher*, 2020 U.S. Dist. LEXIS 92027, *9 (D. N.J. 2020) (noting defendant's "genuine remorse" supported a significant downward variance of for defendant who pleaded guilty). Mr. Lynch's acceptance or responsibility, sincere remorse, and productivity while in jail augur for a variant sentence.

### 5.  Mr. Lynch's lack of significant prior criminal record.

Prior to arrest on the index offense, Mr. Lynch had only a single criminal conviction, for which he received a suspended sentence at age nineteen. PSR at ¶ 31. The absence of a significant prior criminal history, is both a good indicator of his true character, and a strong protective factor for non-recidivism. Because Mr. Lynch has never previously been incarcerated for a criminal offense it would mean more to him "than to a defendant who previously has been imprisoned [and c]onsideration of this factor is consistent with § 3553's directive that the sentence reflects the need for 'just punishment,' § 3553(a)(2)(A), and 'adequate deterrence." *United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006); *see United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously

subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

      **6.**      **Mr. Lynch has made an exemplary transition to pretrial detention and has been productive in jail.**

Since his arrest, Mr. Lynch has been continuously incarcerated at five separate facilities since September 5, 2023, and has made an exemplary transition to pretrial detention. He has engaged in no acts of violence or incurred any serious infractions. Although he has been offered very limited programming opportunities, due in part to the repeated transfers among facilities, he has completed 40-hour classes in anger management, parenting, and family conflict resolution. Most important, as the many letters of support show, Mr. Lynch has worked hard to maintain and improve close relationships with his family members and his daughter, he has matured and gained significant insight into the causes of his problems and many of the corrections he needs to make. This form of self-rehabilitation is essential for his future. Because Mr. Lynch has no significant institutional disciplinary history, no history of institutional violence, or instances where he has been disrespectful toward staff. Mr. Lynch's behavior in pretrial detention supports lenience because it confirms his good character and is predictive of his probable future conduct. *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986).

      **7.**      **Supportive friends and family.**

While incarcerated, Mr. Lynch has created a positive locus of support in his community. He has been in a stable relationship for several years, and has been blessed to have a young daughter who he adores. Mr. Lynch has invested in relationships with family members, friends, and community volunteers. Essentially, Mr. Lynch has created the semblance of a mature system of support that not only helped him take responsibility for his offense, but will support his transition back to into society upon his release. Family and community support are especially

appropriate grounds for a variant sentence because they are the most important buffer against re-offense. *See United States v. Martin*, 520 F.3d 87, 90 (1st Cir. 2008) (affirming 91-month variance based in part on support defendant stood to receive "from his family [and] personal qualities indicating his potential for rehabilitation"); *see also United States v. Stall*, 581 F.3d 276, 288-89 (6th Cir. 2009) (affirming substantial variance based in part on remorse and substantial and family support).

B.    **Nature and Circumstances of the Offense.**

The nature and circumstances of Mr. Lynch's offense are addressed in the offense conduct portion of the PSR as well as the statement of facts submitted at the time of his guilty plea. While the PSR and statement of facts present the relevant information necessary to support Mr. Lynch's conviction, they fail to convey the entire story of the underlying offense. For the purposes of punishment, this Court should consider the additional information provided in the previous section – particularly Mr. Lynch's fulsome apology and expression of remorse - not to diminish Mr. Lynch's sense of personal responsibility, but to provide the proper context within which this Court must determine the appropriate sentence.

C.    **Seriousness of Offense, Respect for the Law, and Just Punishment.**

Mr. Lynch acknowledges he committed a serious offense and must suffer the consequences of his actions. Mr. Lynch feels significant remorse and regret for his offense –for the harm to the victims and his community and the direct harm he has caused his daughter. Mr. Lynch's crime arose from a desire to generate income and limited employment options. Sentencing Mr. Lynch to a the average sentence of 80 months imposed on defendants with similar records who commit similar crimes is appropriate as it would recognize his remorse and the fundamental changes he has been making since his arrest.

### D.    Need to Avoid Unwarranted Sentence Disparities.

As set forth in his objection to the PSR, *see* Point I.B., *infra*, at 2-13, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), is validated and advanced by the imposition of a sentence of 80 months imprisonment consisting of 60 months for Mr. Lynch's use of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i), and 20 months for his commission of a Hobbs Act robbery, in violation of 18 U.S.C. § 1951. This sentence is identical to the average sentence imposed in most similar cases included in the anonymized data provided by the JSIN, by comparison to the types of sentences imposed in similar cases, *see, e.g., United States v. Spicer*, 1:19-cr-00506-RDB, Dkt. 102 (D. Md.) (78 months); *United States v. Torres Enriquez*, 8:19-cr-00214-PWG, Dkt. 93 (D. Md.) (84 months), and to the average sentences imposed only for the Hobbs Act robbery offense where the defendant only possessed or brandished a firearm. *see* Point I.B.1 & 2, *infra*, at 3-6. Indeed, imposing a sentence in excess of 80 months would create a stark sentence disparity among defendants with similar records who have been found guilty of similar conduct.

## III.    IMPOSITION OF A FINE.

Although the Court is authorized to impose a fine in this case, pursuant to USSG § 5E1.2(e), Mr. Lynch requests no fine be imposed because, as the PSR correctly notes, "he has no assets" and "does not appear capable of paying a find." PSR at ¶ 61.

## IV.    RECOMMENDATION FOR FACILITY DESIGNATION WITHIN BUREAU OF PRISON.

After a sentence of imprisonment is imposed the BOP begins the process of designating the offender to a facility for service of the sentence (18 U.S.C. § 3621). The BOP retains exclusive discretion to assign prisoners to any of its facilities, but the Court may specifically make

recommendations at sentencing that the BOP will indeed consider. 18 U.S.C. § 3621(4)(A) & (B). Mr. Lynch respectfully requests that the Court recommend a facility as close to Baltimore, Maryland. Accordingly, if his security level allows, Mr. Lynch respectfully requests the Court recommend he be designated to FCI Petersburg, FCI Lewisburg (PA), or FCI Butner (NC).

## V.    COMMUNITY RE-ENTRY AND REHABILITATION.

To maximize Mr. Lynch's reintegration and transition back to society upon completion of his sentence, the Defense requests the Court include in its order a recommendation that he eventually be transitioned back to the community through a Residential Re-Entry Center for the maximum period allowed under the law. The Second Chance Act (through 18 U.S.C.§ 3621) authorizes the BOP to transfer inmates to community confinement during the last year of their term, provided they have demonstrated need for reintegration services. Mr. Lynch, therefore, respectfully requests the Court to recommend that he be allowed to serve his final year in a community re-entry program in an approved Re-Entry Center.

## VI.    CREDIT FOR TIME SERVED.

Mr. Lynch was arrested in connection with this offense on September 5, 2023, and respectfully requests he receive credit for his time served starting on that date.

## VII.    CONCLUSION.

WHEREFORE based on the foregoing reasons and any others that may appear to the Court or that may develop at the sentencing hearing, Mr. Lynch respectfully requests that this Honorable Court impose a total sentence of eighty (80) months imprisonment followed by three (3) years of supervised release.

Respectfully submitted,
Clarence Lynch
By Counsel

_____/s/_____
Joseph T. Flood, VSB #71716
Sheldon & Flood, PLC
10621 Jones Street, Suite 301-A
Fairfax, VA  22030
(703) 691-8410
(703) 251-0757 (fax)
jflood@sfhdefense.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of Court via CM/ECF and thereby served counsel for the United States on the date of filing.

Respectfully submitted,

Clarence Lynch

By: _____/s/_____
Joseph T. Flood
Counsel for Mr. Lynch